Per Curiam.
 

 Plaintiffs, Jackson County Hog Producers, and SLS 1984-1, SLS 1985-1, SLS 1985-2, and SLS 1985-3, limited partnerships involved in hog production, appeal as of right from the trial court’s grant of summary disposition in favor of defendant and the court’s imposition of discovery sanctions against them. Defendant, Consumers Power Company, cross appeals as of right from the trial court’s imposition of discovery sanctions against it and the trial court’s decision to award it discovery sanctions not to exceed $20,000. The law firm of Fieger, Fieger & Schwartz, plaintiffs’ trial attorneys, contest the trial court’s order imposing discovery sanctions against it. We affirm.
 

 Plaintiffs alleged in its multicount complaint that defendant was liable for damages on the basis of negligence, violations of the Michigan Consumer Protection Act (MCPA), MCL 445.901
 
 et seq:,
 
 MSA 19.418(1)
 
 et seq.,
 
 breach of express and implied warranties, trespass and nuisance, breach of contract, and fraud, as a result of “stray voltage” that invaded plaintiffs’ properties, causing damage to plaintiffs’ hog production operation.
 

 Plaintiffs first argue that the trial court erred in dismissing the negligence portions of their complaint
 
 *77
 
 pursuant to MCR 2.116(C)(7) on the ground that the claim was barred by the applicable statute of limitations. The question whether a claim is within the period of limitation is one of law for the court to decide and is therefore reviewed de novo.
 
 Solowy v Oakwood Hosp Corp,
 
 454 Mich 214, 216; 561 NW2d 843 (1997);
 
 Cardinal Mooney High School v Michigan High School Athletic Ass’n,
 
 437 Mich 75, 80; 467 NW2d 21 (1991). When reviewing a motion for summary disposition under MCR 2.116(C)(7), a court must accept as true a plaintiff’s well-pleaded factual allegations, affidavits, or other documentary evidence and construe them in the plaintiff’s favor.
 
 Guerra v Garrett,
 
 222 Mich App 285, 289; 564 NW2d 121 (1997). If no facts are in dispute and reasonable minds could not differ concerning the legal effect of those facts, whether a plaintiff’s claim is barred by the statute of limitations is a question for the court as a matter of law.
 
 Id.
 
 However, if a material factual dispute exists in such a manner that factual development could provide a basis for recovery, summary disposition is inappropriate.
 
 Id.
 

 Plaintiffs concede that the applicable statute of limitations is three years from the date the cause of action accrues, pursuant to MCL 600.5805(8); MSA 27A.5805(8). Plaintiffs contend, however, that there were questions of fact respecting whether they knew or should have known of the potential for a cause of action against defendant more than three years before the expiration of the limitation period. Alternatively, plaintiffs argue that the trial court erred in not invoking the “continuing-wrongful-acts doctrine” to find that the claim was not barred.
 

 
 *78
 
 A plaintiffs cause of action accrues when all the elements have occurred and can be alleged in a complaint.
 
 Horvath v Delida,
 
 213 Mich App 620, 624; 540 NW2d 760 (1995). However, if the discovery rule applies, a claim does not accrue for the purpose of the running of the limitation period until a plaintiff discovers, or through the exercise of reasonable diligence should have discovered (1) an injury and (2) the causal connection between the injury and a defendant’s breach of duty.
 
 Lemmerman v Fealk,
 
 449 Mich 56, 66; 534 NW2d 695 (1995). It is not necessary that a plaintiff be able to prove each element of the cause of action before the period of limitation begins to run.
 
 Moll v Abbott Laboratories,
 
 444 Mich 1, 21, 24; 506 NW2d 816 (1993). The test to be applied in determining when a cause of action accrued is an objective one, based on objective facts, and not on what a particular plaintiff subjectively believed.
 
 Id.
 
 at 18. Application of the test is a matter of law for the court in the absence of any issue of material fact.
 
 Id.
 
 at 26.
 

 In this case, it is undisputed that if defendant were negligent in allowing stray voltage to damage plaintiffs’ property, the stray voltage problem existed for more than three years preceding the October 1993 filing of plaintiffs’ complaint. Therefore, assuming, without deciding, that the discovery rule applies in this case, we must decide whether plaintiffs knew or should have known, more than three years before filing their complaint, that they had suffered an injury and the possible causal connection between their injury and defendant’s breach.
 
 [1]
 

 
 *79
 
 In support of its motion for summary disposition of the negligence claim, defendant submitted the deposition of David Wade, who was employed by plaintiffs in a managerial capacity from June 1980 until May 1988. Although Wade could not recall exact dates, he testified that during his employment with plaintiffs, he personally observed the effects of stray voltage at plaintiffs’ facilities. He further testified that “numerous” other employees also witnessed the effects of stray voltage. According to Wade, steps were taken sometime before May 1988 to alleviate the problem. These steps included “grounding,” which entailed attaching copper wire to affected equipment and then securing the wire to the ceiling with an aluminum screw. Even after taking these steps, however, plaintiffs continued to suffer production problems. Notably, Wade specifically recalled the use of the term “stray voltage” to describe the problem at plaintiffs’ facilities. Wade also testified that there was an understanding among plaintiffs’ employees that the stray voltage could be affecting the water intake of the animals.
 

 Plaintiffs’ awareness of a potential stray voltage problem before October 1990 was also evidenced by the deposition testimony of plaintiffs’ employees David McMurtrie, Michael Shelters, Bob Schaefer, and Dean Hoefer. Each of these employees gave testimony that was similar to and confirmed the testimony of David Wade. Further, defendant also presented evidence that it sent to each of plaintiffs’ facilities a brochure entitled “Stray Voltage on the
 
 *80
 
 Farm” in 1986 and every year thereafter until 1992, although plaintiffs denied ever receiving the literature.
 

 Plaintiffs respond that they had no reason to attribute the health problems of their animals to stray voltage. In contesting defendant’s motion for summary disposition, plaintiffs argued that defendant misconstrued the deposition testimony of the above-mentioned witnesses. According to plaintiffs, although the testimony of the witnesses revealed that before October 1990, employees of plaintiffs had used the term “stray voltage” loosely to describe various electrical problems experienced at the facilities, none of the witnesses believed, or had reason to believe, that plaintiffs’ production problems were being caused by stray voltage. In fact, plaintiffs presented the deposition testimony of their veterinarian, Dr. Duane Trupiano, in which he stated that he did not attribute the poor health condition of the animals to stray voltage.
 

 However, viewing the evidence presented by the parties in the light most favorable to plaintiffs, we conclude that before October 1990 plaintiffs were aware, or at least should have been aware, that they were suffering damages as a result of stray voltage. Although plaintiffs might not have understood with any degree of specificity the technical aspects of stray voltage, the evidence reveals that they did know, or should have known, that electricity supplied by defendant was potentially harming their animals and, in turn, causing their production to suffer. Further, even if plaintiffs believed that the steps that they had taken to alleviate the problem were successful, the continued production problems should have
 
 *81
 
 alerted plaintiffs to the possibility that the electrical problem was not entirely corrected. Accordingly, the trial court did not err in concluding that sometime before October 1990, plaintiffs knew, or should have known, that stray voltage was causing them injury.
 

 Alternatively, plaintiffs argue that the trial court erred in not invoking the continuing-wrongful-acts doctrine in order to avoid the applicability of the statute of limitations. The continuing-wrongful-acts doctrine states that “[w]here a defendant’s wrongful acts are of a continuing nature, the period of limitation will not run until the wrong is abated; therefore, a separate cause of action can accrue each day that defendant’s tortious conduct continues.”
 
 Horvath, supra
 
 at 626. The essence of plaintiffs’ claim is that stray voltage has persisted for years and continued to plague the facilities in question even at the time plaintiffs drafted their brief for this appeal, thus presenting a perfect case for application of the continuing-wrongful-acts doctrine. We disagree.
 

 Like the plaintiffs in
 
 Horvath,
 
 plaintiffs in this case misapprehend the essence of the continuing-wrongful-acts doctrine. In
 
 Horvath,
 
 the plaintiffs filed suit against the defendants in 1992 for escalating flooding damage allegedly caused by the defendants’ dredging of a lake in 1982. In rejecting the plaintiffs’ attempt to invoke the continuing-wrongful-acts doctrine, this Court stated that “a continuing wrong is established by continual tortious
 
 acts,
 
 not by continual harmful effects from an original completed act.”
 
 Id.
 
 at 627 (emphasis in original). That reasoning is dispositive here. Before October 1990, defendant installed the connections necessary to supply plaintiffs with electricity. This is the original, completed,
 
 *82
 
 and allegedly tortious act, as opposed to the harmful effect of the original act, i.e., the stray voltage. Indeed, this Court has expressly noted that Michigan courts have not recognized a cause of action for continuing negligence.
 
 Id.
 
 at 627, n 2. Accordingly, the continuing-wrongful-acts doctrine does not apply.
 

 Plaintiffs next argue that the trial court erred in dismissing the trespass portion of their complaint pursuant to MCR 2.116(C)(8). Although we disagree with the trial court’s reasoning, we nonetheless conclude that the claim was properly dismissed pursuant to MCR 2.116(C)(7). In our opinion, the trespass claim was nothing more than a restatement of plaintiffs’ claim of negligence, properly barred by the statute of limitations. This Court may affirm a decision of a trial court for reasons different than those relied on by the trial court.
 
 Anderson v Wiegand,
 
 223 Mich App 549, 556; 567 NW2d 452 (1997).
 

 Although plaintiffs assert claims of trespass and nuisance, the gravamen of plaintiffs’ complaint is really a negligence action. Defendant was authorized by plaintiffs to supply electricity. Therefore, the alleged stray voltage would be the result of defendant’s negligence in undertaking that authorized activity, not an “unauthorized invasion” upon plaintiffs’ property that might constitute a trespass. In
 
 Cloverleaf Car Co v Phillips Petroleum Co,
 
 213 Mich App 186, 195; 540 NW2d 297 (1995), this Court stated:
 

 A trespass is an unauthorized invasion upon the private property of another.
 
 Gelman Sciences, [Inc v Dow Chemical Co,
 
 202 Mich App 250, 253; 508 NW2d 142 (1993)]. However, the actor must intend to intrude on the property of another without authorization to do so. If the intrusion was due to an accident caused by negligence or an abnormally
 
 *83
 
 dangerous condition, an action for trespass is not proper. Prosser & Keeton, Torts (5th ed), § 13, pp 73-74.
 

 This reasoning is dispositive here. Plaintiffs’ claim of trespass is nothing more than a camouflaged claim of negligence and thus was properly dismissed, pursuant to MCR 2.116(C)(7), because the claim was barred by the statute of limitations. The trial court’s decision to dismiss plaintiffs’ trespass claim is affirmed.
 

 Plaintiffs also contend that the trial court erred in dismissing their nuisance claim. Although plaintiffs contend that the trial court never specifically addressed their nuisance claim, we believe that dismissal was nonetheless appropriate. In
 
 Forest City Enterprises, Inc
 
 v
 
 Leemon Oil Co,
 
 228 Mich App 57, 76, n 7; 577 NW2d 150 (1998), in the context of addressing a nuisance claim, this Court stated that “[a] continuing wrong is established by continuing tortious
 
 acts,
 
 not by continual harmful effects from an original, completed act.” (Emphasis in original.) Again, because the gravamen of plaintiffs’ claim against defendant is that defendant improperly installed equipment (the negligent act) that caused an unacceptable release of stray voltage (the harmful effect), plaintiffs cannot avail themselves of the continuing-wrongful-acts doctrine because they have not alleged continued tortious acts but rather have claimed that they are suffering the continual harmful effects of a completed tortious act. Accordingly, like plaintiffs’ trespass claim, the nuisance claim is merely a restatement of plaintiffs’ negligence claim and is barred by the statute of limitations.
 

 Plaintiffs next argue that the trial corut erred in granting summary disposition for defendant with regard to its mcpa claim. The trial court reasoned that
 
 *84
 
 defendant’s conduct was exempt from the act pursuant to § 4 of the mcpa, which provides, in pertinent part:
 

 (1) This act does not apply to . . . the following:
 

 (a) A transaction or conduct specifically authorized under laws administered by a regulator board or officer acting under statutory authority of this state or the United States. . . . [MCL 445.904(l)(a); MSA 19.418(4)(l)(a).]
 

 The trial court believed that because the Michigan Public Service Commission extensively regulates defendant’s activities, subsection 4(l)(a) of the MCPA exempted defendant’s conduct from the act.
 

 We decline to address whether defendant’s conduct is exempt from the mcpa by reason of subsection 4(l)(a) because the act is inapplicable to defendant’s conduct for a more basic reason. Plaintiffs’ cause of action under the MCPA was premised on alleged violations of MCL 445.903(1); MSA 19.418(3)(1), which provides, in pertinent part, that “[u]nfair, unconscionable, or deceptive methods, acts or practices in the conduct of
 
 trade or commerce
 
 are unlawful and are defined as follows.” (Emphasis supplied.) The MCPA defines “trade or commerce” as “the conduct of a business providing goods, property, or service
 
 primarily for personal, family, or household,
 
 purposes.” MCL 445.902(d); MSA 19.418(2)(d) (emphasis supplied). In our opinion, the definition of “trade or commerce” renders the mcpa inapplicable to the transaction in this case, where plaintiffs purchased electricity from defendant primarily for the purpose of operating their business rather than “primarily for personal, family, or household purposes.”
 

 
 *85
 
 We recognize that our holding is contrary to
 
 Catallo Associates, Inc v MacDonald & Goren, PC,
 
 186 Mich App 571; 465 NW2d 28 (1990), in which this Court ruled that because subsection 2(c) of the MCPA, MCL 445.902(c); MSA 19.418(2)(c), defines “person” as “a natural person, corporation, trust, partnership, incorporated or unincorporated association, or other legal entity,” the concept of “personal,” as used in the definition of “trade or commerce,” contemplates those transactions “of or relating to a particular person, corporation, trust, partnership, incorporated or unincorporated association, or other legal entity.” By this Court’s reasoning in
 
 Catallo,
 
 because defendant supplied electricity to plaintiffs, and because plaintiffs are “persons” under the mcpa, the electricity was primarily for “personal” use. We conclude that
 
 Catallo
 
 was wrongly decided and decline to follow its analysis.
 

 First, to use the mcpa’s definition of the root word “person” to extrapolate a definition for the word “personal” is not appropriate. The two words are different, and the definition of one should not control the definition of the other. Second, the
 
 Catallo
 
 panel’s definition of “personal” ignores the context in which the word is used, i.e., “personal, family, or household purposes.” Unless defined in the statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. MCL 8.3a; MSA 2.212(1),
 
 Western Michigan Univ Bd of Control v Michigan,
 
 455 Mich 531, 539; 565 NW2d 828 (1997). In defining the term “trade or commerce” as it did, the Legislature intended to limit the mcpa’s applicability to a class of transactions much narrower in scope
 
 *86
 
 than that recognized by the panel in
 
 Catallo.
 
 That is, in limiting the mcpa’s applicability to “the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes,” the Legislature intended to protect consumers harmed from transactions more intimate in nature than the transaction involved in this case. In construing a statute, this Court should avoid any construction that would render a statute, or any part of it, surplusage or nugatory.
 
 Altman v Meridian Twp,
 
 439 Mich 623, 635; 487 NW2d 155 (1992). In our opinion, the decision of the panel in
 
 Catallo
 
 impermissibly renders the Legislature’s limiting language obsolete. Further, at least one federal court, in
 
 Robertson v State Farm Fire & Casualty Co,
 
 890 F Supp 671, 680 (ED Mich, 1995), has expressly rejected the decision of the panel in
 
 Catallo
 
 for the reasons stated herein.
 

 Accordingly, we reject
 
 Catallo
 
 and rule that the services that defendant supplied to plaintiffs were not “primarily for personal, family, or household purposes,” but rather were mainly for the operation of plaintiffs’ business. Because
 
 Catallo
 
 was decided on October 5, 1990, MCR 7.215(H) does not bind us to the decision, and the conflict resolution method set forth in the court rule is not applicable. Although the trial court did not employ the analysis that we rely on, this Court may affirm a trial court’s grant of summary disposition for reasons different than relied on by the trial court.
 
 Wiegand, supra.
 
 Accordingly, we affirm the trial court’s decision to dismiss plaintiffs’ MCPA claim.
 

 Plaintiffs next argue that the trial court erred in assessing monetary sanctions against them and their counsel, appellant Fieger, Fieger & Schwartz, and in
 
 *87
 
 ordering that certain expert witnesses offered by plaintiffs would not be allowed to testify. Specifically, plaintiffs contend that the discovery violations were not committed by plaintiffs but by plaintiffs’ counsel, and, therefore, the trial court should not have penalized plaintiffs for the improper conduct of their attorney. We disagree. This court reviews discovery sanctions for whether the trial court abused its discretion.
 
 Traxler v Ford Motor Co,
 
 227 Mich App 276, 286; 576 NW2d 398 (1998).
 

 Notably, plaintiffs, in their brief on appeal, do not contest that discovery abuses occurred; they merely contend that they should not have suffered the adverse consequences of those abuses. The abuses occurred as a result of plaintiffs’ responses to interrogatories that bore the signature of plaintiffs’ counsel. Plaintiffs filed answers to interrogatories in which plaintiffs stated that they had retained economic experts Michael Behr and Terrance Baulch and that those experts were expected to testify that plaintiffs lost profits in excess of $7 million as a result of stray voltage. According to plaintiffs, Behr and Baulch each formed their opinions on the basis of calculations made after reviewing plaintiffs’ financial records. Plaintiffs also stated that they had retained veterinary experts, Dr. James Kenneth Irving and Dr. D. J. Ellis, who would provide testimony regarding the general detrimental effects of stray voltage on livestock.
 

 However, after plaintiffs answered the interrogatories, Ellis was deposed by defendant and testified that he had not been hired or retained by plaintiffs and did not consider himself an expert on the effects of stray voltage. Irving also testified that he had never been contacted by plaintiffs and did not consider him
 
 *88
 
 self an expert in stray voltage. Behr testified that although he had been retained by plaintiffs, he had not formed any opinions concerning the case at the time that plaintiffs answered the interrogatories. Finally, Baulch testified that he had not been retained by plaintiffs and had not reviewed any documents or made any calculations concerning the case. However, he testified that, on a single occasion, he discussed the case with plaintiffs’ counsel, but he did not provide plaintiffs’ counsel with any opinion respecting damages.
 

 On the basis of the testimony of these witnesses, the trial court concluded that plaintiffs’ answers to interrogatories concerning these witnesses were intentionally false and misleading. In sanctioning plaintiffs, the court not only precluded plaintiffs from offering the testimony of the subject witnesses, but also precluded plaintiffs from offering any retained economic expert or any retained veterinarian, except for Dr. Trupiano, who actually treated animals at plaintiffs’ facilities. Further, the trial court ordered plaintiffs, and the law firm of Fieger, Fieger & Schwartz, to pay defendant $20,000 in attorney fees and expenses.
 

 Plaintiffs argue that the management of discovery requests is a procedural matter within the exclusive control of trial counsel, and, thus, the client should not be sanctioned for conduct of counsel in this regard because the client has no meaningful control over this aspect of discovery. However, the trial court sanctioned plaintiffs for violations of the signature requirements in MCR 2.114(D) and MCR 2.302(G). MCR 2.114(E) provides that “[i]f a document is signed in violation of this rule, the court, on the motion of a
 
 *89
 
 party or on its own initiative,
 
 shall impose on the person who signed it, a represented party, or both,
 
 an appropriate sanction,” including awarding the other party reasonable expenses incurred as a result of a violation of the court rule. (Emphasis supplied.) MCR 2.302(G)(4) provides that “[i]f certification is made in violation of this rule, the court. . .
 
 shall impose upon the person who made the certification, the party on whose behalf the . . . response ... is made, or both,
 
 an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including reasonable attorney fees.” (Emphasis supplied.) Clearly, the emphasized portions of these court rules allowed the trial court to sanction both plaintiffs and trial counsel. In this case, the trial court explained at length its reasons for sanctioning plaintiffs as well as plaintiffs’ counsel, concluding that plaintiffs, as owners of a sophisticated global farming operation, should have monitored the developments of the case and cannot claim ignorance of what their attorney was doing. We cannot say that the trial court’s reasoning constitutes an abuse of discretion. Accordingly, the trial court did not err in sanctioning both trial counsel and plaintiffs.
 

 Plaintiffs also challenge the trial court’s decision to preclude the testimony of the expert witnesses as too severe a sanction. However, because the trial court ultimately dismissed plaintiffs’ entire case and because we do not believe that the trial court’s decision to strike the expert witnesses affected its decision to dismiss the case, review of the severity of the sanction is unnecessary.
 

 On cross appeal, defendant argues that Judge Edward Grant, the successor to Judge Chad C.
 
 *90
 
 Schmucker in this case, erred in not awarding defendant $28,304.10 in attorney fees and expenses after he specifically found that that amount was reasonable. Without explanation Judge Grant stated that he would not award sanctions in excess of the $20,000 originally awarded by Judge Schmucker. Although neither party cites any significant authority, the concept of reasonableness in regard to an award of attorney fees does not denote what was actually expended. Here, it appears that Judge Grant, after hearing
 
 plaintiffs’
 
 motion for relief from Judge Schmucker’s previous order, determined that, under the facts and circumstances surrounding the case, $20,000 was a reasonable sanction even though the evidence established that $28,304.10 was actually expended by defendant. We cannot say that the trial court’s decision to allow the original award of attorney fees and expenses to stand constituted an abuse of discretion.
 

 Defendant also argues that Judge Grant erred in denying its motion for return of $7,500 previously awarded to plaintiffs as discovery sanctions. The record reveals that Judge Schmucker assessed costs amounting to $7,500 against defendant on the ground that defendant had caused unnecessary delays in discovery. Defendant paid this amount to plaintiffs; however, after plaintiffs’ discovery violations were disclosed, defendant moved for then-presiding Judge Grant to order the return of the those costs. Following a hearing regarding the matter, Judge Grant acknowledged Judge Schmucker’s observations respecting plaintiffs’ discovery abuses, but nevertheless determined that the $7,500 should not be returned. Defendant complains that Judge Grant’s
 
 *91
 
 decision to deny its motion for the return of the costs constituted an abuse of discretion. We disagree.
 

 A review of the record reveals that the sanction imposed on defendant for dilatory conduct relating to discovery was unrelated to the discovery abuses committed by plaintiffs. Specifically, during the hearing in which the sanctions were originally ordered, Judge Schmucker stated that he was troubled by defendant’s delay in submitting its interrogatories: the complaint had been filed in October 1993 and defendant had not dispatched its first set of interrogatories until May 1994, or its second set until July 1994. Although the record reveals that Judge Schmucker later determined that plaintiffs’ counsel intentionally committed misrepresentations in answering various questions posed in interrogatories, such misconduct does not excuse defendant’s dilatory conduct in submitting its interrogatories. The parties’ respective abuses of discovery are unrelated, and defendant has not convinced us that its delay in serving interrogatories was predicated on any discovery abuse on the part of plaintiffs. Accordingly, the trial court did not abuse its discretion in denying defendant’s motion for the return of the costs.
 

 Finally, Fieger, Fieger, & Schwartz, which at one time served as trial counsel for plaintiffs, argues that the trial court erred in upholding the imposition of the discovery sanctions against it. We disagree. A trial court’s decision regarding whether a party or attorney has violated the signature requirements of MCR 2.114(D) and MCR 2.302(G) is reviewed for clear error.
 
 Contel Systems Corp v Gores,
 
 183 Mich App 706, 711; 455 NW2d 398 (1990). A decision is clearly
 
 *92
 
 erroneous if we are left with a definite and firm conviction that a mistake has been made.
 
 Id.
 

 Fieger, Fieger & Schwartz contends that in answering the interrogatories as it did, it permissibly represented to defendant what it
 
 expected
 
 the experts to testify about at trial, even though the experts had never represented that they would give such testimony. Further, Fieger, Fieger & Schwartz argues that it never represented that any of the experts would definitively give the testimony that it said they would provide, but rather, it merely conveyed to defendant what it
 
 expected
 
 such testimony to be and what it
 
 expected
 
 the experts to rely on in forming their opinions. Finally, although Fieger, Fieger & Schwartz acknowledges that it stated that the experts had been retained when they, in fact, were not, it contends that this oversight was immaterial.
 

 A review of the answers to interrogatories that plaintiffs provided to defendant reveals that Fieger, Fieger & Schwartz did more than candidly acknowledge that the answers were based solely on plaintiffs’ expectations of what the experts would testify about at trial. Rather, in our opinion, the answers would lead a reasonable person to wrongly conclude that the experts had already formed the opinions referenced in the answers and that the experts would definitively give trial testimony that conformed to the interrogatory answers. For example, although plaintiffs answered that Behr “is expected” to testify that plaintiffs sustained losses in excess of $7 million, plaintiffs went on to answer as follows:
 

 Mr. Behr’s conclusions are based on his analysis of financial records from Plaintiffs’ facilities for the years 1986 through 1993. Behr bases his testimony on number of hogs
 
 *93
 
 sold per year by category (feeder, breeder, boars, etc.), feed costs, annual totals in pounds and dollars, and all other costs. Mr. Behr’s calculations are also set forth in light of profMoss of comparable units.
 

 Considering that at the time that this answer was given, Behr had not formed any opinions or conclusions concerning this case, reviewed any financial records, or made any calculations, we conclude that the trial court was justified in finding that the answer to the question constituted a misrepresentation. The interrogatory answers concerning the other experts are similarly worded.
 

 We believe that there is a difference between the answers given in this case and an answer that candidly acknowledges that the experts have not yet been retained, consulted, or questioned, but, if all goes as expected, will testify in a certain manner. Plaintiffs’ answers in this case are misleading, and the trial court found that they were intentionally so. We conclude that Fieger, Fieger
 
 &
 
 Schwartz has not established that the trial court clearly erred in finding violations of the signature requirements of MCR 2.114 and MCR 2.302.
 

 Affirmed.
 

 [1]
 

 We emphasize that we express no opinion regarding whether the discovery rule applies under these facts. As explained later in the opinion,
 
 *79
 
 even assuming that the discovery rule does apply, plaintiffs’ negligence claims are nevertheless barred by the statute of limitations.